Jenna Dakroub, CA #350170
E: jdakroub@consumerattorneys.com
CONSUMER ATTORNEYS
16130 Ventura Blvd., Suite 300
Encino, CA 91436
T: (602) 807-1525
F: (718) 715-1750

*Attorneys for Plaintiff*
*Marvella Garcia-Mijangos*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| MARVELLA GARCIA-MIJANGOS,<br><br>Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC., TRANS UNION LLC; TOYOTA MOTOR CREDIT CORPORATION D/B/A TOYOTA FINANCIAL SERVICES.<br><br>Defendants. | Case No.: 5:24-cv-1488<br><br>**COMPLAINT AND JURY TRIAL DEMAND**<br><br>1. **F.C.R.A, 15 U.S.C. § 1681**, *et seq.*<br><br>2. **CCRAA, Cal. Civ. Code §1785,** *et seq.* |

## <u>COMPLAINT</u>

Marvella Garcia-Mijangos ("Plaintiff" or "Ms. Garcia-Mijangos"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union, LLC ("Trans Union") (collectively, the "Credit

Bureau Defendants"); and Toyota Motor Credit Corporation d/b/a Toyota Financial Services ("Defendant" or "Defendant Toyota"); (all defendants collectively, "Defendants"), and states as follows:

## **INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning

individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is

in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to

conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors that Plaintiff's account with Defendant Toyota for the Toyota Tacoma was charged-off and had a balance of $60.

12.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b) and the Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785 *et. seq.*, as well as failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i and CCRAA Cal. Civ. Code § 1785 *et. seq*.

13.    Plaintiff also brings a claim against Defendant Toyota for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1) and CCRAA Cal. Civ. Code § 1785 *et. seq*.

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., and CCRAA Cal. Civ. Code § 1785 *et. seq.*, as described herein.

## **PARTIES**

15.    Marvella Garcia-Mijangos ("Plaintiff" or "Ms. Garcia-Mijangos") is a natural person residing in Lake Elsinore, California, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of California, including within this District. Equifax can be served at its registered agent at Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

17.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.    Defendant Experian Information Solutions, Inc. ("Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California, 92626 and is authorized to do business in the State of California,

including within this District. Experian can be served at its registered agent at CT Corporation System, 330 N. Brand Blvd, Glendale, California, 91203.

19.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

20.    Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois, 60661 and is authorized to do business in the State of California, including within this District. Trans Union can be served at its registered agent at Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

21.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.    Defendant Toyota Motor Credit Corporation d/b/a Toyota Financial Services ("Defendant" or "Defendant Toyota") is a California corporation with its headquarters in 6565 Headquarters Drive, W2-5A Plano, TX 75024and is authorized to do business in the State of California, including within this District. Toyota can be

served at its registered agent at CT Corporation System 330 N Brand Blvd, Glendale, CA 91203.

23.    Defendant Toyota is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

26.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

27.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their

grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

28.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

29.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

30.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## Factual Background

31.    The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting

methods undermine the public confidence, which is essential to the continual functioning of the banking system.

32.    The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

33.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

34.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

35.    The Credit Bureau Defendants' consumer reports generally contain the following information:

    (a)    Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

    (b)    Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

    (c)    Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

36.    The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

37.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

38.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

39.    The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

40.    FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

41.    The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

42.    The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

43.    DTI compares the total amount a consumer owes to the total amount a consumer earns.

44.    The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

45.    The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

46.    The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

47.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

48.     Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures. Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

49.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

**Plaintiff Purchased a Car from Gosch Toyota (the "Dealership") and Obtained Financing and Gap Insurance from Toyota**

50.     In February of 2020, Plaintiff purchased a 2020 Toyota Tacoma from the Dealership.

51.     In order to purchase the Toyota Tacoma, Plaintiff financed the vehicle through Defendant Toyota.

52.     As a precautionary measure, Plaintiff purchased Guaranteed Auto Protection ("Gap") Insurance from Defendant Toyota to protect against a potential decrease in value of the car below the amount owed on the auto loan. The purpose of Gap insurance is to cover the difference between the financed amount owed on the

car and the car's actual cash value, in the event of an incident where the car is declared a total loss.

**Plaintiff was in a Car Accident that Resulted in the Total Loss of her Car**

53.    On or about March 10, 2021, Plaintiff was in an accident that resulted in the total loss of her car.

54.    On or about March 23, 2021, Defendant Toyota sent a letter to Plaintiff's car insurance company, Mercury, instructing it to pay $43,609.42 to Defendant Toyota.

55.    On or about March 25, 2021, Mercury sent a check in the amount of $43,609.42 to Defendant Toyota, and the check was cleared on or about April 6, 2021.

56.    Since any balance remaining on Plaintiff's auto loan should have been covered by the Gap Insurance, Plaintiff assumed that the auto loan was paid off entirely and her debt with Defendant Toyota was settled.

**Plaintiff Applies for Credit to Purchase a Smaller and More Affordable Car**

57.    In or around February 2022, Plaintiff, looking to reduce her gas expense, applied for credit to purchase a Subaru Crosstrek, which was smaller and more efficient with regards to gas.

58.    Plaintiff ordered a Subaru Crosstrek from Frank Subaru located in National City, California. However, on the day Plaintiff went to pick up the car a

representative of Frank Subaru informed her that she could purchase the car, but at a much higher rate of approximately 4% APR because of issues with her credit.

59.    Plaintiff was shocked and confused when hearing that her credit was poor because she knew she had excellent credit. Plaintiff was also befuddled because she was initially quoted a 0% APR due to her excellent credit.

60.    As a result, Plaintiff had to keep the car that she had, which was larger and expended more gas.

**Defendants Report that Plaintiff's Toyota Tacoma is Charged-Off with a Balance**

61.    Upon speaking with the Frank Subaru representative, Plaintiff learned that the Toyota Tacoma was reporting as charged-off with a balance of $60.00. Plaintiff was devastated since she took her credit health seriously and was concerned about any negative impact to her credit score.

62.    Plaintiff started investigating and, in or around March 2022, called Defendant Toyota in the hopes of getting some answers.

63.    On or about February 22, 2022, Plaintiff received a letter from Defendant Toyota GAP Insurance (the "February 2022 Letter") which stated on the letter that "THIS IS NOT A BILL." The contents of the letter also stated that Toyota GAP Insurance was going to pay the outstanding balance on the auto loan for the Toyota Tacoma in the amount of $1,532,22.

64.    Plaintiff was confused when she received this letter because so much time had passed since the accident, and she thought that her Mercury car insurance

and GAP insurance claims were processed and paid as of March/April 2021.
Furthermore, Toyota never contacted Plaintiff prior to this to tell her that she owed
any money on the auto loan after her Toyota Tacoma was deemed a total loss.

65.     Upon information and belief, Defendant Toyota reported to the Credit
Bureau Defendants that Plaintiff's Toyota Tacoma was charged off with a balance.

**Plaintiff Applies to Purchase and Finance Another Car**

66.     In or around June 2023, after working on her credit, and thinking the
inaccurate reporting with regards to the Toyota Tacoma charge-off and balance was
resolved, Plaintiff applied to purchase and finance another Subaru Crosstrek as a
smaller and more fuel-efficient alternative to her current vehicle.

67.     Plaintiff was able to get approved for credit to purchase the new car.
However, Plaintiff was unable to get the 0% APR she would have gotten had she
gotten approved in February 2022. Rather, Plaintiff's APR on the auto loan for her
new car was 2.9%.

**Plaintiff Applies for a Personal Loan with Discover**

68.     Plaintiff's backdoor frame and drywall were damaged due to flooding
and her restrooms were in need of maintenance and renovations. However, Plaintiff
did not have the money for these much-needed renovations. Therefore, Plaintiff
decided to apply for a personal loan to cover the cost of such renovations.

69.     On or about June 27, 2023, Plaintiff submitted an application for a personal loan with Discover.

70.     For Discover to evaluate Plaintiff's creditworthiness, it would need to obtain copies of her credit files. Plaintiff provided Discover with her personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

71.     Upon information and belief, Equifax sold a consumer report about Plaintiff to Discover in response to Plaintiff's personal loan application.

**Discover Denies Plaintiff's Credit Application**

72.     On or about June 27, 2023, Discover received and reviewed Equifax's consumer report about Plaintiff.

73.     On or about June 27, 2023, Discover denied Plaintiff's personal loan application. Upon information and belief, Discover denied Plaintiff's credit application in reliance on information contained in the Equifax consumer report about Plaintiff.

74.     Plaintiff was perplexed at the credit denial. She had been working hard on making sure her credit was excellent.

75.     Upon information and belief, Plaintiff's credit application was denied because of the charge-off and balance owed reporting on the Equifax consumer report.

76.     Upon information and belief, Equifax inaccurately published in the consumer report to Discover that Plaintiff's account with Defendant Toyota for the Toyota Tacoma was charged-off and had a balance of $60.

77.     Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Applies for a Personal Loan with PenFed Credit Union ("PenFed")**

78.     Plaintiff re-alleges and incorporates by reference paragraph 68 above as if fully stated herein.

79.     Plaintiff was also in need of credit to cover her living expenses and debts.

80.     Therefore, on or about June 27, 2023, Plaintiff submitted an application for a personal loan with PenFed.

81.     For PenFed to evaluate Plaintiff's creditworthiness, it would need to obtain copies of her credit files. Plaintiff provided PenFed with her personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

82.     Upon information and belief, Experian sold a consumer report about Plaintiff to PenFed in response to Plaintiff's personal loan application.

**PenFed Denies Plaintiff's Credit Application**

83.    On or about June 27, 2023, PenFed received and reviewed Experian's consumer report about Plaintiff.

84.    On or about June 27, 2023, PenFed denied Plaintiff's personal loan application in reliance on information contained in the Experian consumer report about Plaintiff.

85.    Plaintiff was perplexed at the credit denial. She had been working hard on making sure her credit was excellent.

86.    Upon information and belief, Plaintiff's credit application was denied because of the charge-off and balance owed reporting on the Experian consumer report.

87.    Upon information and belief, Experian inaccurately published in the consumer report to PenFed that Plaintiff's account with Defendant Toyota for the Toyota Tacoma was charged-off and had a balance of $60.

88.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff Reviews her Credit Reports/Files with the Credit Bureau Defendant**

89.    In or around November 2023, Plaintiff reviewed her credit reports/files with each Credit Bureau Defendant and discovered that her account with Defendant Toyota's account for the Toyota Tacoma was reporting as charged-off with a balance of $60.

90.    Plaintiff was deeply upset and frustrated upon realizing that the issue with her account with Defendant Toyota had not been resolved as she thought it was.

91.    Based on the foregoing, the Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's First Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

92.    On or about December 26, 2023, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the charge-off and $60 balance associated with her auto loan account with Defendant Toyota for the Toyota Tacoma with each of the Credit Bureau Defendants (the "December 2023 Dispute").

93.    Plaintiff explained that the charged-off auto loan account with Defendant Toyota and any balance associate therewith was inaccurate. Plaintiff explained that she purchased GAP Insurance from Defendant Toyota which should have covered any amounts owed as a result of the total loss which wasn't covered by her Mercury car insurance.

94.    Plaintiff also included: (i) her driver's license; (ii) proof of address in the form of an electricity bill; (iii) her date of birth; (iv) her social security number; (v) the Letter of Guarantee from Defendant Toyota which stated that Defendant Toyota will release its security interest in the Toyota Tacoma to Mercury upon receipt

of \$43,609.42; (vi) proof that the check from Mercury in the amount of \$43,609.42 was deposited by Defendant Toyota; and (vi) the February 2022 Letter.

95.    Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

### Defendant Equifax's Unreasonable Dispute Reinvestigation

96.    Upon information and belief, Equifax sent Defendant Toyota an automated credit dispute verification ("ACDV") pursuant to Plaintiff's December 2023 Dispute to Equifax.

97.    Upon information and belief, Defendant Equifax forwarded Plaintiff's dispute to Defendant Toyota.

98.    On or about January 18, 2024, Plaintiff received a dispute response from Equifax stating it had verified their reporting as accurate.

99.    Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's December 2023 Dispute.

100.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's December 2023 Dispute.

101.    Thereafter, Defendant Equifax failed to correct or delete the charge-off and \$60 balance appearing in Plaintiff's credit file. As of the date hereof, Equifax continues to report the inaccurate charge-off and \$60 balance.

102.  Equifax failed to conduct a reasonable reinvestigation of Plaintiff's December 2023 Dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Defendant Experian's Unreasonable Dispute Reinvestigation

103.  Upon information and belief, Experian sent Defendant Toyota an automated credit dispute verification ("ACDV") pursuant to Plaintiff's December 2023 Dispute to Experian.

104.  Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's December 2023 Dispute.

105.  Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiff's December 2023 Dispute.

106.  Thereafter, Defendant Experian failed to correct or delete the charge-off and $60 balance appearing in Plaintiff's credit file. As of the date hereof Defendant Experian has not responded to Plaintiff's December 2023 Dispute and continues to report the inaccurate charge-off and $60 balance.

107.  As of the date hereof, upon information and belief, Defendant Experian has failed to respond to Plaintiff's December 2023 Dispute.

108.  Experian failed to conduct a reasonable reinvestigation of Plaintiff's December 2023 Dispute, or any reinvestigation whatsoever, to determine whether the

disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Defendant Trans Union's Unreasonable Dispute Reinvestigation

109.   Upon information and belief, Trans Union failed to send Defendant Toyota an automated credit dispute verification ("ACDV") pursuant to Plaintiff's December 2023 Dispute to Trans Union.

110.   On or about January 5, 2024, Plaintiff received a response from Trans Union stating that they were unable to verify her identity. Trans Union claimed it was unable to verify Plaintiff's identity even though Plaintiff included her driver's license, proof of address, date of birth, and social security number with her December 2023 Dispute.

111.   Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's December 2023 Dispute.

112.   Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's December 2023 Dispute.

113.   Thereafter, Defendant Trans Union failed to correct or delete the charge-off and $60 balance appearing in Plaintiff's credit file.

114.   Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's December 2023 Dispute, or any reinvestigation whatsoever, to determine whether the

disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes

115.   The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

116.   The credit bureaus, Equifax, Experian, Trans Union, and non-party Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

117.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

118.   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

119.   Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

120.   Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

121.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

122.   These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

123.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

124.   The data furnishers, like Defendant Toyota, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

125.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Toyota's Unreasonable Dispute Reinvestigation**

126.   Upon information and belief, in or around January 2024, Defendant Toyota received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

127.   Upon information and belief, Defendant Toyota failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's December 2023 Dispute.

128.   Upon information and belief, Defendant Toyota verified the disputed information as accurate to Defendant Equifax in or around January 2024.

129.   Upon information and belief, in or around January 2024, Defendant Toyota received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

130.   Upon information and belief, Defendant Toyota failed to review all relevant information provided by Defendant Experian regarding Plaintiff's December 2023 Dispute.

131.   Upon information and belief, in or about January 2024, Defendant Toyota verified the disputed information as accurate to Defendant Experian.

132.   Defendant Toyota violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

**Plaintiff's Second Dispute to Defendant Trans Union Regarding the Inaccurate Credit Reporting**

133.  As of January 17, 2024, Defendant Trans Union was reporting that Plaintiff's account with Defendant Toyota for the auto loan was charged-off and had a balance of $60.

134.  On or about January 17, 2024, Plaintiff sent a second dispute (the "January 2024 Dispute") to Defendant Trans Union. Once again, the dispute included: (i) Plaintiff's driver's license; (ii) proof of address in the form of an electricity bill; (iii) Plaintiff's date of birth; (iv) Plaintiff's social security number; (v) the Letter of Guarantee from Defendant Toyota which stated that Defendant Toyota will release its security interest in the Toyota Tacoma to Mercury upon receipt of $43,609.42; (vi) proof that the check from Mercury in the amount of $43,609.42 was deposited by Defendant Toyota; and (vi) the February 2022 Letter.

135.  Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and to send her a corrected copy of her credit report.

**Defendant Trans Union's Unreasonable Reinvestigation**

136.  Upon information and belief, Defendant Trans Union failed to send Defendant Toyota an automated credit dispute verification ("ACDV") pursuant to Plaintiff's January 2024 Dispute to Defendant Trans Union.

//

//

137.   Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

138.   Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's January 2024 Dispute.

139.   Thereafter, Defendant Trans Union failed to correct or delete the charge-off and $60 balance appearing in Plaintiff's credit file. As of the date hereof Defendant Trans Union has not responded to Plaintiff's January 2024 Dispute and continues to report the inaccurate charge-off and $60 balance.

140.   As of the date hereof, upon information and belief, Defendant Trans Union failed to respond to Plaintiff's January 2024 Dispute.

141.   Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's January 2024 Dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff Applies for a Capital One Credit Card**

142.   On or about May 16, 2024, Plaintiff submitted an application for a credit card with Capital One.

143.   For Capital One to evaluate Plaintiff's creditworthiness, it would need to obtain copies of her credit files. Plaintiff provided Capital One with her personal

identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

144.    Upon information and belief, the Credit Bureau Defendants sold a consumer report about Plaintiff to Capital One in response to Plaintiff's personal loan application.

### Capital One Denies Plaintiff's Credit Application

145.    On or about May 16, 2024, Capital One received and reviewed a consumer report from the Credit Bureau Defendants about Plaintiff.

146.    On or about May 16, 2024, Capital One denied Plaintiff's credit card application in reliance on information contained in the consumer report from the Credit Bureau Defendants about Plaintiff.

147.    Upon information and belief, Plaintiff's credit application was denied because of the charge-off and $60 balance reporting on the consumer report from the Credit Bureau Defendants.

148.    Upon information and belief, the Credit Bureau Defendants inaccurately published in the consumer report to Capital One that Plaintiff's account with Defendant Toyota for the Toyota Tacoma was charged-off and had a balance of $60.

149.    The Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Defendant Toyota Continues to Furnish and the Credit Bureau Defendants Continue to Report Inaccurate Information on Plaintiff's Credit File**

150.    Plaintiff reasonably believes that Defendant Toyota continued to furnish data to the Credit Bureau Defendants inaccurately suggesting that Plaintiff's auto loan account with Defendant Toyota for the Toyota Tacoma was charged-off and had a balance of $60 at some point between February 2022 and June of 2024.

151.    Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff's auto loan account with Defendant Toyota for the Toyota Tacoma was charged-off and had a balance of $60 at some point between February 202 and June of 2024.

152.    As a result of the inaccurate charged-off account and $60 balance, the Defendants made it practically impossible for Plaintiff to continue to obtain credit.

153.    Plaintiff was extremely upset, frustrated and humiliated by the erroneous reporting. On multiple occasions Plaintiff was denied needed credit. As a result, the renovations to Plaintiff's home were delayed for approximately two months.

154.    Plaintiff also needed the credit for air filters for the air conditioners in her house and unfortunately had to suffer in the California weather without proper air conditioning.

155.    Plaintiff was relegated to obtain a loan of $25,000.00 from her relative to cover the foregoing expenses, which loan cost her $3,000.00.

156.    Furthermore, in an attempt to cover her expenses and debts, Plaintiff had to take out cash withdrawals from her Wells Fargo credit card on three separate occasions, totaling approximately $11,000.00, at very high interest rates, which Plaintiff continue to make payments on.

157.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

158.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

159.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006)

(noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at \*6 (S.D.N.Y. Nov. 19, 2008).

160.   The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.   Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

161.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; the expenditure of time and money trying to obtain credit by other more expensive means;  and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

162.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

163.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

164.   On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

165.   Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

166.   Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

167.   Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

168.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

169.   As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; the expenditure of time and money trying to obtain credit by other more expensive means; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

170.   Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

171.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II

**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

172.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

173.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a 30-day time limit for the completion of such an investigation.  *Id*.

174.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

175.    On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, the charged-off account and $60 balance reported about her auto loan account with Defendant Toyota between February 2022 and June 2024.

176.  In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

177.  In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

178.  In response to Plaintiff's disputes, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

179.  The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

180.  As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit

reporting; the expenditure of time and money trying to obtain credit by other more expensive means; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

181.   The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

182.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer**
**(First Claim for Relief Against Defendant Toyota)**

183.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

184.   Defendant Toyota furnished the inaccurate information relating to Plaintiff to the Credit Bureau Defendants.

185.   Defendant Toyota violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all

relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the Credit Bureau Defendants; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the Credit Bureau Defendants.

186.   As a result of Defendant Toyota's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; the expenditure of time and money trying to obtain credit by other more expensive means; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

187.   Defendant Toyota's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

188.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Toyota in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**

## Cal. Civ. Code § 1785.14
### Failure to Follow Reasonable Procedures to Assure Maximum possible Accuracy
### (Third Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

189.   Plaintiff re-alleges and incorporates by reference all of the allegations set forth in the preceding paragraphs as if fully stated herein.

190.   Each of the Credit Bureau Defendants are a "consumer reporting agenc[ies]" as defined by Cal. Civ. Code § 1785.3(d).

191.   At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by Cal. Civ. Code § 1785.3(b).

192.   At all times pertinent hereto, each of the above-mentioned credit reports were a "consumer report" as that term is defined by Cal. Civ. Code § 1785.3(c).

193.   The Credit Bureau Defendants violated Cal. Civ. Code § 1785.14 by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the background check report they sold about Plaintiff as well as the information they published within them.

194.   As a result of the Credit Bureau Defendants' violations of the CCRAA, Plaintiff has suffered a range of actual damages including, without limitation, damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; the expenditure of time and

money trying to obtain credit by other more expensive means; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

195.   The Credit Bureau Defendants willfully violated Cal. Civ. Code § 1785.14 in that its conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to Cal. Civ. Code § 1785.31(a)(2). Alternatively, the Credit Bureau Defendants' conduct was negligent, entitling Plaintiff to recover under Cal. Civ. Code § 1785.31(a)(1).

196.   Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from each Credit Bureau Defendant in an amount to be determined by the Court pursuant to Cal. Civ. Code § 1785.31(d), § 1785.31(a)(1) and/or § 1785.31(a)(2).

**<u>COUNT V</u>**
**Cal. Civ. Code § 1785.16**
**Failure to Perform a Reasonable Reinvestigation**
**(Fourth Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

197.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein at length.

198.   The CCRAA requires consumer reporting agencies, like each of the Credit Bureau Defendants, to reinvestigate and record the status of disputed

information when notified by a consumer that an item is inaccurate or incomplete. Cal. Civ. Code § 1785.16(a).

199.    When a consumer reporting agency's reinvestigation determines that disputed information is found to be inaccurate, missing, or can no longer be verified by the evidence submitted, the consumer reporting agency is required to correct or delete that information from the consumer's file.  Cal. Civ. Code § 1785.16(b).

200.    On multiple occasions, Plaintiff initiated a dispute with the Credit Bureau Defendants and disputed inaccurate information reporting in his credit file and requested that the Credit Bureau Defendants correct and/or delete the inaccurate, misleading, and highly damaging information.

201.    The Credit Bureau Defendants violated Cal. Civ. Code § 1785.16(b) of the CCRAA by failing to reasonably reinvestigate Plaintiff's dispute(s).

202.    The Credit Bureau Defendants' violations of the CCRAA were willful. Therefore, the Credit Bureau Defendants are liable to Plaintiff for actual, statutory, and punitive damages in amounts to be determined ar trial. Cal. Civ. Code § 1785.31(a)(2).

203.    Alternatively, the Credit Bureau Defendants' violations of the CCRAA were negligent. Therefore, Experian is liable to Plaintiff for statutory and actual damages in amounts to be determined at trial. Cal. Civ. Code § 1785.31(a)(1).

204.    In any event, the Credit Bureau Defendants are liable for Plaintiff's reasonable attorneys fees and costs, pursuant to Cal. Civ. Code § 1785.31(d).

## COUNT VI
### Cal. Civ. Code § 1785.25
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer(Second Claim for Relief Against Defendant Toyota)**

205.  Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein at length.

206.  Toyota violated Cal. Civ. Code § 1785.25 by furnishing information on a specific transaction or experience to the Credit Bureau Defendants that Toyota knew or should have known is incomplete or inaccurate.

207.  Toyota received disputes from the Credit Bureau Defendants with respect to the inaccurate reporting of the charged-off account and $60 balance.

208.  Even after receiving the disputes, Toyota continued to inaccurately furnish information to the Credit Bureau Defendant about the charged-off account and $60 balance.

209.  Toyota's acts, as described above, were done willfully and knowingly. In the alternative, Toyota's acts were done negligently.

210.  Toyota's  violations of the CCRAA caused Plaintiff to suffer a range of actual damages including, without limitation, loss of time and money trying to correct her credit report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; the expenditure of time and money trying to obtain credit by other more expensive means; and emotional

distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

211.   As a result of the foregoing violations of the CCRAA, Toyota is liable to Plaintiff for actual damages, punitive damages, and attorneys' fees and costs pursuant to Cal. Civ. Code § 1785.31.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Actual damages pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

ii.   Statutory damages pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

iii.  Punitive damages pursuant to 15 U.S.C. §1681n;

iv.   Costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

v.    Actual damages pursuant to Cal. Civ. Code §§ 1785.31(a)(1) and/or 1785.31(a)(2);

vi.   Statutory damages pursuant to Cal. Civ. Code §§ 1785.31(a)(1) and/or 1785.31(a)(2);

vii.  Punitive damages pursuant to Cal. Civ. Code § 1785.31(a)(2);

viii. Costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1785.31(d);

ix.     Punitive damages to be determined at trial, for the sake of example and

punishing Defendants for its malicious conduct, pursuant to Cal. Civ. Code §

3294;

x.     xiv. All pre-judgment and post-judgment interest as may be allowed under the

law; and

xi.     Granting further relief, in law or equity, as this Court may deem appropriate

and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: July 17, 2024                    */s/ Jenna Dakroub*
                                         Jenna Dakroub, CA #350170
                                         E: jdakroub@consumerattorneys.com
                                         CONSUMER ATTORNEYS
                                         16130 Ventura Blvd., Suite 300
                                         Encino, CA 91436
                                         T: (602) 807-1525
                                         F: (718) 715-1750

                                         *Attorney for Plaintiff*
                                         *Marvella Garcia-Mijangos*